1
2
3
4
5
6
7
8
9

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

ELEANOR SOLO,                                    CASE NO. CV F 05-0578 LJO

                    Plaintiff,               **DECISION ON SOCIAL SECURITY**
                                             **COMPLAINT**
        vs.                                  (Docs. 14-16.)

JO ANNE B. BARNHART,
Commissioner of Social
Security,

                    Defendant.
_____/

## INTRODUCTION

Plaintiff Eleanor R. Solo ("plaintiff") seeks this Court's review of an administrative law judge's ("ALJ's") decision that plaintiff is neither disabled nor entitled to disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433. Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by a December 1, 2005 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings. Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request to find that plaintiff is disabled, or alternatively, to remand for further proceedings.

# BACKGROUND

## Personal Background

Plaintiff is age 40 and has a high school education and past work experience as a waitress, school bus driver and certified nursing assistant.  (AR 21, 26, 89, 108, 113, 260, 262.)

## Administrative Proceedings

On December 13, 2001, plaintiff protectively filed her application for disability insurance benefits to claim disability since May 5, 2001 based on lower back condition, anxiety and depression. (AR 51, 54, 107.)[1]  With its June 27, 2002 Notice of Disapproved Claims, the Social Security Administration ("SSA") denied plaintiff's claim and determined that her condition is not severe enough to prevent plaintiff to work.  (AR 39.)[2]  On August 27, 2002, plaintiff filed her Request for Reconsideration and noted that she experienced back pain, migraines, dyslexia, depression and poor comprehension.  (AR 38.)  With its January 2, 2003 Notice of Reconsideration, SSA again denied plaintiff's claim and determined that plaintiff's condition is not severe enough to prevent her to work. (AR 34.)[3]

On March 13, 2003, plaintiff filed her Request for Hearing by Administrative Law Judge and claimed inability "to function in a working environment," limited reading, writing and comprehensive abilities, and that she experienced severe migraines, neck, shoulder and back pain, anxiety, depression, post-traumatic stress disorder, and dyslexia.  (AR 33.)  After a January 15, 2004 ALJ hearing at which plaintiff appeared unrepresented, the ALJ issued her February 24, 2004 decision to conclude that plaintiff has the residual functional capacity to perform a significant range of light work and is neither

---

[1]     Plaintiff claims she filed an application for Supplemental Security Income ("SSI") under the Act's Title XVI, 42 U.S.C. §§ 1381-1882c, but points no application in the AR.

[2]     The heading of SSA's notice indicates "Supplemental Security Income."  (AR 39.)  The notice's first sentence states: "We are writing about your claim for Supplemental Security Income (SSI) payments."  (AR 39.)  However, a June 27, 2002 SSA Disability Determination and Transmittal form indicates that plaintiff pursued only a disability insurance benefits claim under the Act's Title II.  (AR 32.)

[3]     The heading of SSA's notice again indicates "Supplemental Security Income."  (AR 34.)  The notice's first sentence states: "You asked us to take another look at your claim for Supplemental Security Income (SSI) payments." However, a January 2, 2003 SSA Disability Determination and Transmittal Form indicates that plaintiff pursued only a disability insurance benefits claim under the Act's Title II.  (AR 31.)

1  disabled nor entitled to disability insurance benefits.  (AR 27, 28.)

2      On June 8, 2004, counsel was appointed for plaintiff.  (AR 13.)  On that same date, plaintiff

3  submitted to SSA's Appeals Council her Request for Review of Hearing Decision/Order to claim that

4  the ALJ's decision is arbitrary and capricious and not supported by evidence.  (AR 11.)  On February

5  18, 2005, the Appeals Council denied plaintiff's request for review to render the ALJ's February 24,

6  2004 decision as the Commissioner's final determination subject to this Court's review.  (AR 4.)

7                    **Medical History And Records Review**[4]

8                  ***Donald Van Fossan, M.D., Treating Neurologist***

9      During 2000-2001, plaintiff treated with neurologist Donald Van Fossan, M.D. ("Dr. Van

10  Fossan") for her lumbar strain, right shoulder strain and chronic tension headaches.  (AR 219-226.)

11  August 21, 2001 notes reflect that plaintiff "returned to work driving a school bus." (AR 219.)  Dr. Van

12  Fossan's notes are silent as to anxiety and depression and treatment thereof.  (AR 219-226.)

13                      ***Mark Twain -St. Joseph's Hospital***

14      Plaintiff treated at Mark Twain-St. Joseph's Hospital, and August 30, 2001 notes reflect that on

15  May 15, 2001, plaintiff had sprained her back when she  slid down the stairwell of a school bus.  (AR

16  143.) Plaintiff was assessed with lumbar strain. (AR 141.) On October 22, 2001, a physician's assistant

17  assessed plaintiff with depression/anxiety and chronic lumbar myositis.  (AR 139.)  On May 30, 2002,

18  plaintiff complained of moodiness and was assessed with major depression.  (AR 125.)  The focus of

19  plaintiff's later treatment was migraines.  (AR 117-121, 124, 126-128, 132, 136.)

20                  ***Les P. Kalman, M.D., Consultative Psychiatrist***

21      Psychiatrist Les P. Kalman, M.D. ("Dr. Kalman"), conducted a June 11, 2002 consultative

22  examination of plaintiff.  (AR 227.)  Plaintiff's complaints included pain, feeling "crappy" and mood

23  swings.  Plaintiff told Dr. Kalman that she "has been depressed for a few years," "suffers from panic,"

24  lacks "interest in things" and socialization, and wants "to sleep all day." (AR 227.)  Dr. Kalman's

25  mental status examination revealed plaintiff's cooperation, good eye contact, alertness, orientation, intact

---

26

27          [4]     As noted by the Commissioner, plaintiff challenges the ALJ's evaluation of plaintiff's mental, not physical, impairment to render immaterial plaintiff's treatment for her physical impairments.  Plaintiff does not dispute the Commissioner's contention and in her opening brief "concedes that the medical evidence supports the exertional and postural

28  limitations as found by the ALJ."  As such, this Court will focus on plaintiff's mental limitations.

memory, fair attention, concentration, insight and judgment, depressed mood, restricted affect, and logical and goal-directed thoughts.  (AR 228-229.)  As for daily activities, Dr. Kalman noted that plaintiff "does her own shopping, and housekeeping" and manages her transportation and to pay her bills.  (AR 229.)  For social functioning, Dr. Kalman noted that plaintiff gets along with family and has friends but stays to herself.  (AR 229.)  Dr. Kalman assessed that plaintiff: (1) has "decreased ability" to relate and interact with supervisors and co-workers and to withstand stress and pressures of daily work activities; (2) is able to understand and remember simple one and two-step job instructions and to maintain concentration and attention; and (3) is unable to deal with the public.  (AR 229.)  Dr. Kalman concluded that plaintiff "could probably work on a part-time basis" and diagnosed depressive disorder, not otherwise specified, rule out dysthymic and panic disorders, and a 60 Global Assessment of Functioning ("GAF").  (AR 229.)  Dr. Kalman's prognosis was that plaintiff's "psychiatric condition is not expected to improve significantly within the next six months."  (AR 229.)

### Janet O'Brien, M.D., Consultative Internist

Board-certified internist Janet O'Brien, M.D. ("Dr. O'Brien"), conducted a December 5, 2002 comprehensive internal medicine examination to address plaintiff's complaints of migraines, "back is out," right shoulder pain, anxiety and panic attacks.  (AR 232.)  Plaintiff informed Dr. O'Brien that plaintiff experienced anxiety and depression "for the last year" and has "about two panic attacks a week during which she feels like she cannot get her breath."  (AR 233.)  Plaintiff indicated no improvement from Xanax and Zoloft.  (AR 233.)

Dr. O'Brien diagnosed headaches consistent with migraine headaches, in poor control, low back pain, right shoulder pain, and history of anxiety and panic attacks per the claimant, in only fair control.  (AR 237.)  Dr. O'Brien opined: "There are no limitations based on the objective findings from today's physical examination."  (AR 237.)  Dr. O'Brien assessed that plaintiff is able to: (1) stand/walk for six hours in an eight-hour workday; (2) ambulate to perform routine banking, shopping, and travel to school or work; (3) walk one block or more over rough or uneven surfaces; (4) use public transportation; (5) climb a few steps with handrail use; (6) sit for six hours in an eight-hour workday; and (7) lift/carry without limitation.  (AR 237.)  Dr. O'Brien found neither postural, manipulative, visual, communicative nor workplace environmental limitations.  (AR 237.)

4

***Non-Examining State Agency Physicians***

Mario Merando, M.D. ("Dr. Merando"), a California Disability Determination Services ("DDS") physician, completed a June 27, 2002 Mental Residual Functional Capacity Assessment to conclude generally that plaintiff was no more than not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 164-165.) Dr. Merando completed a June 27, 2002 Psychiatric Review Technique to conclude that plaintiff experiences mood disturbance, accompanied by sleep disturbance, decreased energy and difficulty concentrating or thinking. (AR 173.) Dr. Merando concluded that plaintiff had mild to moderate restriction/difficulties in daily living activities, maintaining social functioning and concentration, persistence or pace. (AR 180.) On November 20, 2002, another DDS physician affirmed Dr. Merando's assessment. (AR 170.)

George A. Jansen, Sr., M.D., a DDS physician, completed a March 13, 2002 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift/carry 20 pounds occasionally and 10 pounds frequently; (2) stand/walk or sit six hours in an eight-hour workday; (3) push/pull subject to the lift/carry limitations; and (4) occasionally climb ramp/stairs, balance, stoop, kneel and crouch. (AR 208, 209.) Dr. Jansen restricted plaintiff from climbing ladder/rope/scaffolds and crawling. (AR 209.)

J.E. Thornburg, M.D., a DDS physician, completed a December 26, 2002 Physical Residual Functional Capacity Assessment to conclude that plaintiff is able to: (1) lift 20 pounds occasionally and 10 pounds frequently; (2) stand/walk or sit about six hours in an eight-hour workday; (3) push/pull subject to the lift/carry limitations; (4) frequently climb, balance, kneel, crouch and crawl; (5) occasionally crawl; and (6) perform no less than light work. (AR 186.)

***Sukhnandan S. Sidhu, M.D., Consultative Psychiatrist***

Board eligible psychiatrist Sukhnandan S. Sidhu, M.D. ("Dr. Sidhu"), conducted a November 15, 2003 comprehensive psychiatric evaluation of plaintiff. (AR 238.) Plaintiff chiefly complained of anxiety and depression and noted symptoms, beginning three years ago, of easily crying, stressed and overwhelmed, sleeping difficulty, night sweats, increased withdrawal, dislike of talking to people, feelings of being followed, anxiety attacks with shortness of breath and cold sweats, difficulty concentrating, forgetfulness, and hopelessness. (AR 238.) As for daily activities, plaintiff noted that

1   she drives, shops with her son, spends most of her day at home watching television but does neither

2   chores nor cooks. (AR 240.) Plaintiff reported "fair relationship with family and friends." (AR 240.)

3   Dr. Sidhu observed that plaintiff "seems to be exaggerating her disability." (AR 240.) Dr. Sidhu's

4   mental status examination revealed plaintiff's normal speech, coherent and organized thought process,

5   hopelessness, worthlessness, depressed mood, sad affect, alertness, orientation, at least average

6   intelligence, and intact attention, concentration, insight and judgment. (AR 240, 241.)

7           Dr. Sidhu diagnosed depressive disorder, not otherwise specified, anxiety disorder, not otherwise

8   specified, and a 61-70 GAF. (AR 241.) Dr. Sidhu noted the absence of "major cognitive deficits" and

9   plaintiff's good prognosis. (AR 242.) As for functional assessment, Dr. Sidhu found no impairment in

10   ability to: (1) understand, remember and carry out simple one- or two-step job instructions; (2) perform

11   detailed and complex instructions; (3) relate and interact with supervisors, coworkers, and public; (4)

12   maintain persistence and pace; and (5) perform work activities without special or additional supervision.

13   (AR 242.) Dr. Sidhu found mild-to-moderate impairment in plaintiff's ability to adapt to normal work

14   environment stresses. (AR 242.)

15                     ***John Tim Rourke, Ph.D., Treating Clinical Psychologist***

16           Clinical Psychologist John Tim Rourke, Ph.D. ("Dr. Rourke"), completed an undated Short Form

17   Evaluation for Mental Disorders ("evaluation form") after plaintiff's most recent of irregular visits on

18   April 30, 2004. (AR 251.) In the chiefly check boxes form, Dr. Rourke noted a diagnosis of Post

19   Traumatic Stress Disorder, chronic, Bipolar Disorder, hypomanic type, and mixed personality features

20   – histrionic and borderline. (AR 251.) With the evaluation form, Dr. Rourke checked boxes to note

21   plaintiff's cooperative interview behavior, irritability, poor impulse control, orientation to three, mildly

22   impaired concentration, average intelligence, depressed and angry/agitated mood, labile and hypomanic

23   affect, tangential and loose thought process, and moderately impaired judgment and insight. (AR 251-

24   253.) Dr. Rourke noted that plaintiff "suffers from mood instability, periods of high agitation." (AR

25   251.) Dr. Rourke assessed that plaintiff had poor ability to: (1) remember and carry out complex

26   instructions; (2) maintain concentration, attention and persist in an assigned activity; (3) perform

27   activities within a schedule and maintain regular attendance; (4) complete a normal workday and

28   workweek without significant interruption from a psychologically based symptom presentation or

distress; (5) respond appropriately to changes or demands in a work setting; and (6) appropriately respond to the demands of a work supervisor.  (AR 254.)  Dr. Rourke assessed   that plaintiff had fair ability to understand, remember and carry out simple instructions.  (AR 254.)

### *Medications*

Plaintiff's medications have included Emerg, Zyrtec, Premarin, Soma, Vicodin, Xanax .25 mg and .5 mg, Zoloft 50 mg and 200 mg, Paxil and Valium.  (AR 112, 229, 234, 239.)

### **Plaintiff's Activities And Testimony**

### *Reports And Questionnaires*

In an August 27, 2002 Reconsideration Disability Report, plaintiff claim that she experienced severe migraines, dyslexia, increased temper and pressure, difficulty to finish tasks and to remember, poor reading, writing and math comprehension, and worsened back pain to prevent driving, sitting, standing and lifting.  (AR 61, 63, 64.)

Plaintiff completed a January 2002 Daily Activities Questionnaire to note that on an average day, she lays around and watches television.  (AR 97.)  Plaintiff awakes three or four times nightly.  (AR 97.)  Plaintiff is unable to sweep, mop, cook or stand too long.  (AR 97.)  Plaintiff's father and children prepare her meals and perform household chores.  (AR 98.)  Plaintiff shops for basic necessities biweekly or monthly with the help of her son who drives or carries groceries.  (AR 98.)  Plaintiff drives but suffers neck, shoulder and back pain and migraines if she drives "long."  (AR 99.)  Plaintiff angers easily.  (AR 100.)  Plaintiff is forgetful and needs more time to complete tasks.  (AR 101.)  Plaintiff has no difficulty to follow instructions.  (AR 101.)  Plaintiff is unable to retain information which she reads.  (AR 99.)  Plaintiff is unable to work because driving hurts her back.  (AR 101.)

Plaintiff's friend Jeannie Jessup ("Ms. Jessup") completed a January 18, 2002 Daily Activities Questionnaire (Third Party Information) to note that on a typical day plaintiff transports her children to school, performs light housekeeping and sits or lies down to watch television.  (AR 103.)  Driving, sweeping and mopping are difficult for plaintiff although plaintiff is able to sweep and clean the counter and dishes.  (AR 104, 105.)  Plaintiff's father and children prepare plaintiff's meals.  (AR 104.)  Plaintiff shops only for basic needs without assistance.  (AR 104.)  Standing and rotating causes plaintiff discomfort.  (AR 105.)  Plaintiff enjoys watching television and movies and listening to music.  (AR 65.)

1    Plaintiff knows most of the words to Reba McEntire's songs.  (AR 65.)  Plaintiff has no difficulties

2    getting along with others but is occasionally short tempered.  (AR 65.)  Plaintiff is forgetful, loses her

3    train of thought, and has problems with written comprehension.  (AR 66.)  Plaintiff rarely leaves her

4    home.  (AR 67.)

5            Plaintiff completed a September 19, 2002 Daily Activities Questionnaire to note that on an

6    average day, plaintiff watches television, takes a "small walk," and lies down with her feet up.  (AR 72.)

7    Plaintiff sleeps three to five hours at night and takes Xanax and Zoloft for sleep.  (AR 72.)  Plaintiff

8    needs assistance to get out of the bath.  (AR 72.)  Plaintiff's children prepare meals, shop, perform

9    household chores and drive for plaintiff who is able to wash, dry and fold clothes.  (AR 73.)  Plaintiff

10   watches television and movies and experiences difficulty to read because of dyslexia.  (AR 74.)  Plaintiff

11   walks and drives when she goes out but migraines prevent her to drive.  (AR 74.)  Plaintiff feels anxious

12   and tired and has become withdrawn.  (AR 75.)  Plaintiff has difficulty to complete tasks.  (AR 76.)

13   Plaintiff is unable to work because of neck, shoulder and back pain, chronic migraines, and inability to

14   sleep and stand or sit for long periods.  (AR 76.)  Plaintiff is unable physically to drive a school bus.

15   (AR 76.)  Plaintiff becomes easily agitated from chronic pain and lack of sleep.  (AR 76.)  Plaintiff is

16   unable to tolerate being around people because she becomes anxious and argumentative.  (AR 77, 79.)

17           Plaintiff completed a September 19, 2002 Pain Questionnaire to note that she experiences head,

18   neck, shoulder and back pain and migraines three times weekly.  (AR 86.)  Plaintiff's pain is caused by

19   driving, sitting, walking, lifting, moving, bending, reading, food smells and dust.  (AR 86.)  Rest relieves

20   plaintiff's pain.  (AR 86.)  Plaintiff takes several pain medications which cause no side effects except

21   an upset stomach.  (AR 86.)  Warm baths, sitting in the dark and massage relieves plaintiff's pain.  (AR

22   87.)  Plaintiff's pain interferes with her driving, household chores and carrying a shopping bag.  (AR 87.)

23   Plaintiff's migraines have been under control.  (AR 87.)  Plaintiff is able to walk slowly a block, to stand

24   or sit 30 minutes or less at a time, and to perform light housekeeping.  (AR 88.)

25           Ms. Jessup competed a September 20, 2002 Daily Activities Questionnaire (Third Party

26   Information) to note that plaintiff spends a typical day watching television, going to the store, and sitting

27   and laying around a lot.  (AR 80.)  Plaintiff is able to shower but needs help to get in and out of the bath

28   tub.  (AR 81.)  Plaintiff's children assist with meal preparation and shopping.  (AR 81.)  Plaintiff

manages her finances.  (AR 82.)  Plaintiff does not need assistance to go out, has a drivers license but needs assistance to get out of the car when she drives.  (AR 82.)  Plaintiff watches a lot of television and enjoys music.  (AR 83.)  Plaintiff has difficulty with reading comprehension.  (AR 83.)  Plaintiff has become withdrawn.  (AR 83.)  Plaintiff has problems to remember doctors' appointments and grocery items even with a list.  (AR 84.)  Plaintiff is unable to swim more than 15-20 minutes.  (AR 85.)

In a statement filed with her request for an ALJ hearing, plaintiff claimed to experience difficulty sleeping, forgetfulness, preoccupation, withdrawal from social activity, inability to complete physical activities, and increased depression and anxiety.  (AR 59.)

### Plaintiff's January 15, 2004 ALJ Hearing Testimony

At the start of the January 14, 2004 ALJ hearing, the ALJ addressed with plaintiff that plaintiff appeared without a representative:

> ALJ:  . . . I note that you come today without an attorney, without a representative.  You don't need an attorney for these proceedings.  But if you'd like the opportunity to talk to somebody, I will allow you to postpone your case one time only to do that.  Attorneys work on what's called a contingency, meaning they don't require you to pay money up front, and only collect a fee if you win the case.  Do you want to take that opportunity now, or do you want to proceed today without representation?
>
> CLMT: I don't need an attorney.  Right?
>
> ALJ: You don't need an attorney, but some people have attorneys.  I'm giving you the opportunity to look for one or talk to one, if you'd like to do that.
>
> CLMT: No.
>
> ALJ: Okay.  You want to proceed today without representation?
>
> CLMT: Yes.  (AR 258-259.)

After plaintiff elected to proceed without representation, the ALJ noted: "This is a Title II case.  I have Ms. Solo's date last insured 12 of '06, and I have a protected filing date 12/21 of '01."  (AR 259.)

At the hearing, plaintiff testified that dyslexia causes her to see letters backwards and difficulty to read although she was able to decipher the ALJ hearing notice.  (AR 260-261.)  Plaintiff is able to perform simple adding and subtracting with her fingers.  (AR 261.)

Plaintiff selected May 5, 2001 as her disability onset date because that is when she fell, hurt her back and started "yelling at the kids."  (AR 261.)  Plaintiff has not worked since that date.  (AR 261.)

Plaintiff lives in a house with her then teenage children.  (AR 262.)  Plaintiff is able to dress and

bathe without assistance.  (AR 262.)  Plaintiff starts but does not finish household chores and neither washes dishes, cleans the house, mops, vacuums nor does yard work.  (AR 262.)  Plaintiff's father or children perform such chores.  (AR 263.)  Plaintiff grocery shops.  (AR 263.)

Plaintiff spends most of her day watching television.  (AR 263.)  Plaintiff drives and smokes a pack of cigarettes a day.  (AR 263.)  Plaintiff is able to drive up to 45-60 minutes.  (AR 264.)  Plaintiff sleeps one and a half to two hours a night.  (AR 264.)

Plaintiff had seen Dr. Rourke up to twice a month but had last seen him three or four months prior to the ALJ hearing.  (AR 264.)  When asked how plaintiff's anxiety and depression affect her ability to work, plaintiff responded: "Well, before I liked people, and now I just – I don't like them.  I think they're – just people are evil, and they hurt you, and it doesn't have to be like that."  Plaintiff experiences troubles breathing during panic attacks which arise no less than three times a week.  (AR 268.)  Medication lessens the severity of plaintiff's panic attacks, which last five to ten minutes.  (AR 269.)  Plaintiff was a little better when she was seeing a psychiatrist because she got out more and was not afraid.  (AR 269.)

Plaintiff's then current medications included Elavil, Paxil, Soma, Xanax and Vicodin.  (AR 265.)  As for side effects, plaintiff noted the medications are to assist with sleep but do not.  (AR 265.)  Plaintiff estimates that she is able to walk three blocks and to sit 30 minutes.  (AR 266.)  Plaintiff is able to pick up five pounds.  (AR 266.)

Plaintiff experiences everyday pain in her neck, shoulder and lower back which she assigned an eight on a one to ten severity scale.  (AR 267-268.)

### *Vocational Expert Susan Muranda's January 15, 2004 Testimony*

Vocational expert Susan Muranda ("Ms. Muranda") testified at the January 15, 2004 ALJ hearing that plaintiff's bus driver work was semi-skilled, medium, that her waitress work was unskilled, or potentially semi-skilled, and that her certified nursing assistant work was semi-skilled, medium.  (AR 272.)

As a hypothetical question, the ALJ asked Ms. Muranda to assume a person who: (1) is age 37 with a high school education and plaintiff's past relevant work; (2) is able to sit or stand/walk six hours of an eight-hour day; (3) is able to lift/carry 20 pounds occasionally and 10 pounds frequently; (4) is able

1    to stoop and bend occasionally; (5) has fair ability to relate to coworkers, to deal with the public, to

2    maintain attention and concentration, to understand, remember and carry out complex and detailed job

3    instructions, to interact with supervisors, and to deal with work stress. (AR 272.) Ms. Muranda testified

4    that such person would be unable to perform plaintiff's past work. (AR 273.) Ms. Muranda testified

5    that such person is able to perform jobs, including small parts assembler (15,000 sedentary jobs and

6    97,000 light jobs), storage facility rental clerk (12,000 jobs in California), and charge account clerk

7    (10,000 jobs in California).

8                                    **ALJ's Findings**

9           In her February 24, 2004 decision, the ALJ identified the specific issue as whether plaintiff is

10   under a disability defined as inability to engage in substantial gainful activity due to a medically

11   determinable physical or mental impairment which can be expected to result in death or that has lasted

12   or can be expected to last for a continuous period of not less than 12 months. (AR 20.) In concluding

13   plaintiff is not disabled and thus not entitled to disability insurance benefits, the ALJ found:

14          1.     Plaintiff has an impairment or combination of impairments considered severe but which

15                 do no meet or medically equal an impairment listed in the Listing of Impairments,20

16                 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments").

17          2.     Plaintiff's allegations regarding her limitations are not totally credible.

18          3.     Plaintiff has the residual functional capacity to lift and/or carry up to 20 pounds

19                 occasionally and 10 pounds frequently, to sit, stand or walk up to six hours (each) in an

20                 eight-hour workday, and to occasionally stoop or bend.

21          4.     Plaintiff has a fair ability to relate to coworkers, to interact with supervisors, to deal with

22                 the public, to understand and carry out detailed job instructions, to maintain attention and

23                 concentration, and to deal with work stress.

24          5.     Plaintiff has the residual functional capacity to perform a significant range of light work.

25          6.     Although plaintiff's exertional limitations preclude her to perform the full range of light

26                 work, using section 202.21 of the Medical-Vocational Guidelines, 20 C.F.R., Part 404,

27                 Subpart P, Appendix 2 ("Medical-Vocational Guidelines"), there are a significant

28                 number of jobs in the national economy which plaintiff is able to perform. Such jobs

                                              11

1  include small parts assembler (112,000 jobs in California), storage rental clerk (12,000

2  jobs in California), and account clerk (10,000 jobs in California).  (AR 27-28.)

### DISCUSSION

#### Standard Of Review

Congress has provided limited judicial review of a Commissioner's decision made through an ALJ.  *See* 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . .).  A court must uphold the Commissioner's decision, made through an ALJ, when the determination is not based on legal error and is supported by substantial evidence.  *See Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812 F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work contrary to treating physician's findings).[5]  Substantial evidence is "more than a mere scintilla," *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance, *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

The record as a whole must be considered, weighing both the evidence that supports and detracts from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is substantial evidence to support the administrative finding, or if there is conflicting evidence that will support a finding of either disability or nondisability, the finding of the Commissioner is conclusive. *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9th Cir. 1987).  If the evidence is susceptible to more than one rational interpretation, the court may not substitute its judgment for that of the Commissioner. *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9th Cir. 1999).

This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

---

[5]     "The district court properly affirms the Commissioner's decision denying benefits if it is supported by substantial evidence and based on the application of correct legal standards." *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th Cir. 1997).

1  whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9th Cir. 1988).  "A decision of the ALJ will not be

2  reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9th Cir. 2005).

3        Plaintiff bears the burden to prove that she is disabled which requires presentation of "complete

4  and detailed objective medical reports of his condition from licensed medical professionals." *Meanel*

5  *v. Apfel*, 172 F.3d 1111, 1113 (9th Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

6  Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

7  404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

8  or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

9  whether you are disabled or blind.  You are responsible for providing that evidence.")

10        Here, plaintiff claims disability since May 5, 2001 based on lower back condition, anxiety and

11  depression. (AR 51, 54, 107.)  Plaintiff concedes that the medical evidence supports the ALJ's findings

12  on exertional and postural limitations but contends plaintiff's "non-exertional mental limitations are

13  more severe and consistent with those found by" Dr. Rourke and Dr. Kalman.

14        With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's February

15  24, 2004 decision.

16  **Record Development**

17        Plaintiff argues that "the ALJ failed to adequately develop the record of this indigent and

18  unrepresented claimant who had significant and severe mental problems."  The Commissioner responds

19  that the record "was neither ambiguous nor inadequate to allow for proper evaluation of the mental

20  health evidence."

21        "An ALJ's duty to develop the record further is triggered only when there is ambiguous evidence

22  or when the record is inadequate to allow for proper evaluation of the evidence." *Mayes v. Massanari*,

23  276 F.3d 453, 460 (9th Cir. 2001).  An ALJ has an independent duty to develop fully the record,

24  particularly when the claimant is unrepresented and has a mental impairment. *Higbee v. Sullivan*, 975

25  F.2d 558, 561 (9th Cir. 1992); *DeLorme v. Sullivan*, 924 F.2d 841, 849 (9th Cir. 1991) (record

26  development "is especially important" because mentally ill persons may be incapable to protect

27  themselves from possible benefits loss by furnishing necessary evidence).

28        Plaintiff specifically complains that the ALJ failed to obtain psychologist Dr. Rourke's treatment

records and assessment and to consider Dr. Rourke's diagnosis. The Commissioner points out that the Appeals Council reviewed Dr. Rourke's evaluation form responses and determined that Dr. Rourke had not provided clinical documentation to support his assessment.

Plaintiff fails to demonstrate ambiguous evidence or inadequate record to allow for proper evaluation of plaintiff's mental condition. As for functional assessment, consultative psychiatrist Dr. Sidhu found no impairment in ability to: (1) understand, remember and carry out simple one- or two-step job instructions; (2) perform detailed and complex instructions; (3) relate and interact with supervisors, coworkers, and public; (4) maintain persistence and pace; and (5) perform work activities without special or additional supervision. (AR 242.) Dr. Sidhu found mild-to-moderate impairment in plaintiff's ability to adapt to normal work environment stresses. (AR 242.) Dr. Sidhu noted the absence of "major cognitive deficits" and plaintiff's good prognosis. (AR 242.) Non-examining physician Dr. Merando concluded generally that plaintiff was no more than not significantly limited in understanding and memory, sustained concentration and persistence, social interaction and adaptation. (AR 164-165.) Dr. Merando noted that plaintiff had mild to moderate restriction/difficulties in daily living activities, maintaining social functioning and concentration, persistence or pace. (AR 180.) Another DDS physician affirmed Dr. Merando's assessment. (AR 170.) "An ALJ is required to recontact a doctor only if the doctor's report is ambiguous or insufficient for the ALJ to make a disability determination." *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); 20 C.F.R. §§ 404.1512(e), 416.912(e). Here, with support in the record, the ALJ found adequate evidence to make a determination regarding plaintiff's disability.

Plaintiff relies on Dr. Rourke's check off responses to an undated evaluation form, but such responses are not entitled to controlling weight. *See Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Murray v. Heckler*, 722 F.2d 499, 501 (9th Cir. 1983) (expressing preference for individualized medical opinions over check off forms); *see Batson v. Commissioner*, 359 F. 3d 1190, 1195 (9th Cir. 2003) (ALJ properly discounted a physician's checklist form which lacked supportive evidence, was contradicted by other statements and assessments of claimant's condition, and was based on claimant's subjective descriptions). Moreover, plaintiff fails to clarify Dr. Rourke's role as a treating provider. His evaluation form indicates plaintiff's "irregular" visits since her January 14, 2003 intake session. (AR 251.)

Plaintiff indicated she had seen Dr. Rourke up to twice a month but failed to explain why she had not seen him three or four months prior to the ALJ hearing.  (AR 264.)  Plaintiff and her counsel failed to present Dr. Rourke's records to the Appeals Council and this Court or to explain such failure.  Plaintiff appears to stretch her alleged mental limitations to support her position.[6]  Despite plaintiff's mental condition and prior unrepresented status, record development is unnecessary.

### Counsel Waiver

Plaintiff asserts that the ALJ deprived plaintiff of "her right to counsel" with the ALJ's comment that plaintiff did not need an attorney and failure to inform plaintiff that "an attorney would normally have the duty of developing the claimant's supporting medical evidence."  The Commissioner responds that plaintiff "was fully apprized of her right to representation and was provided ample opportunity to obtain legal aid."

Plaintiff takes the ALJ's "you don't need an attorney" comment out of context in that the ALJ added: "But if you'd like the opportunity to talk to somebody, I will allow you to postpone your case one time only to do that."  (AR 258.)  After the ALJ explained availability of contingency fee attorneys, plaintiff sought confirmation that plaintiff did not need an attorney.  (AR 258.)  Again, the ALJ reiterated that "I'm giving you the opportunity to look for one or talk to one, if you'd like to do that."  (AR 258.)  After plaintiff declined, the ALJ again asked plaintiff if plaintiff wanted to proceed without representation.  (AR 258.)  Again, the plaintiff responded that she did.  (AR 259.)

Despite the ALJ's multiple inquires, plaintiff indicated three times that she desired to proceed without counsel.  The record demonstrates that SSA and the ALJ informed plaintiff of her right to representation and that plaintiff declined it in favor of proceeding.  Moreover, when denying plaintiff's claim initially and on reconsideration, SSA's notices informed plaintiff:

> You can have a friend, lawyer, or someone else help you.  There are groups that can help you find a lawyer or give you free legal services if you qualify.  There are also lawyers who do not charge unless you win your appeal.  Your local Social Security office has a list of groups that can help you with your appeal.  (AR 36, 42.)

The ALJ's Notice of Hearing to plaintiff urged plaintiff to obtain a representative "right away" if so

---

[6] Of particular note, the ALJ found plaintiff's allegations regarding her limitations "are not totally credible." (AR 27.)  Dr. Sidhu observed that plaintiff "seems to be exaggerating her disability."  (AR 240.)

1   desired and that a representative may present evidence, "state your case, and present written statements

2   about the facts and law." (AR 44, 46.)

3       Despite plaintiff's contentions, "[l]ack of counsel does not affect the validity of the hearing

4   unless the plaintiff can demonstrate prejudice or unfairness in the administrative proceedings." *Key v.*

5   *Heckler*, 754 F.2d 1545, 1551 (9th Cir. 1985). Plaintiff presents no evidence of prejudice or unfairness

6   in the administrative proceedings, including the ALJ hearing and record development. The absence of

7   counsel is of no avail to plaintiff.

8                                    **Mental Residual Functional Capacity**

9       Plaintiff argues that ALJ's mental residual functional capacity finding is not supported by

10  substantial evidence. The Commissioner disagrees and contends that the ALJ "reasonably concluded

11  that Plaintiff retained the ability to perform a reduced range of light work and had only a fair ability to

12  relate to coworkers, supervisors and the public, to maintain attention and concentration, to understand,

13  remember and carry out complex and detailed job instructions, and to deal with work stress." (AR 27.)

14      Plaintiff fails to substantiate that ALJ erred to give greater weight to Dr. Sidhu and Dr.

15  Merando's assessments. As for function assessment, Dr. Sidhu found only mild-to-moderate impairment

16  in plaintiff's ability to adapt to normal work environment stresses. (AR 242.) Dr. Merando concluded

17  that plaintiff was no more than not significantly limited in understanding and memory, sustained

18  concentration and persistence, social interaction and adaptation. (AR 164-165.) Consistent with Dr.

19  Sidhu and Dr. Merando, the ALJ characterized as fair plaintiff's ability to deal with work stress and to

20  relate to coworkers, supervisors and the public. Plaintiff acknowledged she had no difficulty to follow

21  instructions. (AR 101.)

22      Plaintiff criticizes the ALJ's evaluation of consultative psychiatrist Dr. Kalman. The Ninth

23  Circuit Court of Appeals distinguishes opinions among physicians who treat claimants (treating

24  physicians), who examine but do not treat claimants (examining physicians), and who neither treat nor

25  examine claimants (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 839 (9th Cir. 1995). "And

26  like the opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another

27  doctor, can only be rejected for specific and legitimate reasons that are supported by substantial evidence

28  in the record." *Lester*, 81 F.3d at 830. An ALJ may meet his obligation to set forth specific, legitimate

                                             16

1  reasons based on substantial evidence in the record "by setting out a detailed and thorough summary of

2  the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."

3  *Magallanes v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989); *Cotten v. Bowen*, 799 F.2d 1403, 1408 (9th Cir.

4  1986). "The ALJ must do more than offer his conclusions. He must set forth his own interpretations

5  and explain why they, rather than the doctors', are correct." *Embrey v. Bowen*, 849 F.2d 418, 421-422

6  (9th Cir. 1988).

7      The ALJ properly discounted Dr. Kalman's assessments that plaintiff is unable to deal with the

8  public and limited to part-time work:

9        In evaluating Dr. Kalman's opinion, I note that it is vague and unspecific in certain
        aspects. Secondly, he provides no basis for his opinion that the claimant is not able to
10       deal with the public. In fact, the claimant informed Dr. Kalman that she did her own
        shopping and could manage her own transportation (Ex. 4F, p. 3). These activities
11       clearly involve routine public contact. Also, she was co-operative with Dr. Kalman,
        whom she did not know before the examination, and made good "eye contact" with him
12       (Ex. 4F, p. 2). I give no weight to Dr. Kalman's opinion that the claimant has no ability
        to relate to the public or could not withstand the stress and pressures of full-time work
13       as those opinions are based solely on the claimant's own allegations and are wholly
        unsupported by the medical evidence, including Dr. Kalman's own examination. (AR
14       24.)

15      The ALJ set out a detailed and thorough summary of the facts, medical record and opinions, and

16  testimony, stated her interpretation thereof, and made findings as discussed above. (AR 21-26.) The ALJ

17  was faced with accepting the assessment of Dr. Kalman or the opinions of Dr. Sidhu and Dr. Merando.

18  The ALJ disfavored Dr. Kalman's assessment and provided specific, legitimate reasons to do so. The

19  ALJ properly noted the absence of grounds that plaintiff is unable to deal with the public. An ALJ may

20  reject a physician's opinion whether or not it is contradicted, if the opinion is "brief and conclusory in

21  form with little in the way of clinical findings to support its conclusion." *Magallanes*, 881 F.2d at 747.

22  The ALJ further correctly noted inconsistencies with Dr. Kalman's assessment. Inconsistencies and

23  ambiguities in a physician's opinion regarding disability may constitute specific, legitimate reasons to

24  reject the opinion. *Matney v. Sullivan*, 981 F.2d 1016, 1020 (9th Cir. 1992); *see Johnson v. Shalala*, 60

25  F.3d 1428, 1433 (9th Cir. 1995) (ALJ properly rejected physician's contradictory assessment not

26  substantiated by medical evidence). The ALJ properly discounted Dr. Kalman's assessment to the extent

27  it was based on plaintiff's self-serving statements. An ALJ may reject a physician's report based on a

28  claimant's exaggerated claims. *See, e.g., Sandgathe*, 108 F.3d at 980. A physician's opinion of

17

disability "premised to a large extent upon claimant's own accounts of his symptoms and limitations" may be disregarded where those complaints have been "properly discounted." *Fair v. Bowen*, 885 F.2d 597, 605 (9th Cir. 1989) (citing *Brawner v. Sec. of Health & Human Servs.*, 839 F.2d 432, 433-434 (9th Cir. 1988)); *see Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997) ("no physician has been able to find a link between [claimant's] complaints and known medical pathologies"). As noted above, the ALJ found plaintiff's allegations regarding her limitations "are not totally credible." (AR 27.) Plaintiff does not challenge the ALJ's credibility finding. Based on the evidence, the ALJ reasonably determined that plaintiff was able to engage in public contact and accommodated Dr. Kalman's assessment of decreased ability to relate and interact with supervisors and coworkers and to withstand daily work stress and pressures.

**Medical-Vocational Guidelines**

Plaintiff contends that her severe non-exertional limitations precluded the ALJ's use of the Medical-Vocational Guidelines. The Commissioner responds that the ALJ properly applied the Medical-Vocational Guidelines as a framework. As a reminder, after finding that plaintiff could perform reduced light work, the ALJ used section 202.21 of the Medical-Vocational Guidelines as a framework with Ms. Muranda's testimony to conclude that plaintiff is able to perform a significant number of jobs. (AR 26-28.)

In the final step of the five-step disability evaluation, the Commissioner has the burden to show, in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work that exists in the national economy. *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001). The Commissioner may meet this burden by testimony of a vocational expert or reference to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

If a claimant has significant non-exertional impairments, an ALJ cannot rely on the Medical-Vocational Guidelines (also known as "grids"). *Osenbrock*, 240 F.3d at 1162. "Non-exertional limitations are limitations that do not directly affect a claimant's strength." *Buckart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988). An ALJ correctly applies the Medical-Vocational Guidelines when a claimant fails to establish a significant non-exertional impairment. *Marci v. Chater*, 93 F.3d 540, 545 (1996). If the Medical-Vocational Guidelines fail to accurately describe a claimant's limitations, an ALJ

1  may not rely on the Medical-Vocational Guidelines alone to show the availability of jobs for the

2  claimant and must hear testimony of a vocational expert. *Reddick v. Charter*, 157 F.3d 715, 729 (9th Cir.

3  1998); *Jones*, 760 F.2d at 998. When vocational expert testimony is used, the vocational expert must

4  identify a specific job or jobs in the national economy having requirements that the claimant's physical

5  and mental abilities and vocational qualifications would satisfy. *Osenbrock v. Apfel*, 240 F.3d at 1162-

6  1163.[7]

7      In *Desrosiers v. Secretary of Health and Human Servs.*, 846 F.2d 573, 576 (9th Cir. 1988), the

8  Ninth Circuit Court of Appeals provided ALJs guidance to address claims of non-exertional limitations:

9      [T]he fact that a non-exertional limitation is alleged does not automatically preclude
       application of the grids. The ALJ should first determine if a claimant's non-exertional
10     limitations significantly limit the range of work permitted by his exertional limitations.
       *Razey v. Heckler*, 785 F.2d 1426, 1430 (9th Cir. 1986); *Blacknall v. Heckler*, 721 F.2d
11     1179, 1181 (9th Cir. 1983); *Olde v. Heckler*, 707 F.2d 439, 440 (9th Cir. 1983).

12         The ALJ must weigh conflicting evidence concerning the claimant's past work
       experience, education, and present psychological and physical impairments. The ALJ
13     then applies the grids to these factors, ensuring that the final determination will be both
       consistent with other similar cases and expeditious. The claimant may challenge the
14     sufficiency of the evidence supporting the ALJ's assessment. A non-exertional
       impairment, if sufficiently severe, may limit the claimant's functional capacity in ways
15     not contemplated by the guidelines. In such a case, the guidelines would be inapplicable.

16         All this can be accommodated to a system of fair and expeditious disposition of
       claims by those asserting pain or other non-exertional limitations. It is not necessary to
17     permit a claimant to circumvent the guidelines simply by alleging the existence of a non-
       exertional impairment, such as pain, validated by a doctor's opinion that such
18     impairment exists. To do so frustrates the purpose of the guidelines.

19  *Desrosiers*, 846 F.2d at 577 (citing decisions from the Second, Fourth, Fifth, Sixth and Eighth Circuit

20  Courts of Appeals).

21      As noted above, plaintiff failed to establish a significant non-exertional impairment to limit the

22

23      [7]    The Ninth Circuit Court of Appeals has further noted:

24         When a claimant's non-exertional limitations are "sufficiently severe" so as to significantly limit
       the range of work permitted by the claimant's exertional limitations, the grids are inapplicable. *Desrosiers*,
25     846 F.2d at 577. In such instances, the Secretary must take testimony of a vocational expert, *Jones*, 760
       F.2d at 998, and identify specific jobs within the claimant's capabilities. *Kail v. Heckler*, 722 F.2d 1496,
26     1498 (9th Cir. 1984). Thus, the grids will be inappropriate where the predicate for using the grids – the
       ability to perform a full range of either medium, light or sedentary activities – is not present.

27

28  *Burkhart v. Bowen*, 856 F.2d 1335, 1340 (9th Cir. 1988).

range of work permitted by her exertional limitations. The ALJ properly accommodated plaintiff to find

plaintiff has fair ability to relate to coworkers, to interact with supervisors, to deal with the public, to

understand and carry out detailed job instructions, to maintain attention and concentration, and to deal

with work stress. (AR 27.) The ALJ correctly obtained Ms. Muranda's assistance to determine erosion

of the job base due to plaintiff's non-exertional limitations. Ms. Muranda identified more that 125,000

jobs which plaintiff is able to perform with her residual functional capacity. Plaintiff establishes no error

in the ALJ's use of the Medical-Vocational Guidelines.

### **Vocational Expert Testimony**

Plaintiff argues that "the ALJ provided only one hypothetical to the vocational expert . . . that

did not include all of the significant mental limitations that are supported by the record." Plaintiff

further argues that since the ALJ's hypothetical question to Ms. Muranda "was inconsistent with

plaintiff's limitations," the Commissioner may not rely on it to meet its shifting burden of proof. The

Commissioner responds that the ALJ's hypothetical question to Ms. Muranda "contained all of the

limitations that the ALJ found credible and supported by the record" and that the ALJ properly relied

on Ms. Muranda's response to the hypothetical question.

As noted above, in the final step of the five-step disability evaluation, the Commissioner has the

burden to show, in light of a claimant's residual functional capacity, he/she can engage in other

substantial gainful work that exists in the national economy. *Osenbrock*, 240 F.3d at 1162. The

Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects

all the claimant's limitations." *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995). Alternatively, the

Commissioner can refer to the Medical-Vocational Guidelines. *Osenbrock*, 240 F.3d at 1162.

An ALJ may take administrative notice of any reliable job information, including the services

of a vocational expert. *Johnson*, 60 F.3d at 1435. When vocational expert testimony is used, the

vocational expert must identify a specific job or jobs in the national economy with requirements that the

claimant's physical and mental abilities and vocational qualifications satisfy. *Osenbrock*, 240 F.3d at

1162-1163.

An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

evidence in the record." *Osenbrock*, 240 F.3d at 1165. An ALJ may so limit a hypothetical even when

1   medical evidence conflicts. *Magallanes v. Bowen*, 881 F.2d 747, 756 (9th Cir. 1989).  "An ALJ is free

2   to accept or reject restrictions in a hypothetical question that are not supported by substantial evidence."

3   *Osenbrock*, 240 F.3d at 1165; *see Magallanes*, 881 F.2d at 756-757.  The parameters of an ALJ's

4   hypothetical questions need not "include any alleged impairments that the ALJ has rejected as untrue."

5   *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997).  An ALJ is not bound to accept restrictions in a

6   hypothetical question of claimant's counsel.  *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

7   　　　The ALJ's hypothetical question to Ms. Muranda included limitations supported by substantial

8   evidence.  Despite conflicts, the ALJ was not required to include restrictions, suggested by plaintiff but

9   not supported by substantial evidence.  The ALJ properly omitted limitations which plaintiff has failed

10  to establish.  The hypothetical question accommodated plaintiff's mental limitations and was proper.

11  **SSI Claim**

12  　　　Plaintiff asserts that the ALJ failed to consider and make findings on plaintiff's SSI claim to

13  require remand for specific findings on it.  The Commissioner responds that plaintiff filed only a

14  disability insurance claim and that SSA's claim denial notices contained typographical errors referring

15  to an SSI claim.

16  　　　The record reflects that plaintiff filed a disability insurance benefits application.  (AR 51.)

17  Plaintiff points to no SSI application on record.  Plaintiff attempts to take advantage of SSA error in

18  sending out notices incorrectly referring to SSI claims.  The flip side of plaintiff's argument that SSA's

19  notices dissuaded plaintiff to file a SSI claim is that SSA did not determine plaintiff's disability

20  insurance benefits claim initially or on reconsideration.  The record reflects otherwise and that SSA

21  treated plaintiff's claim as one for disability insurance benefits.  (AR 31, 32.)  At the start of the January

22  15, 2004 ALJ hearing, the ALJ noted: "This is a Title II case.  I have Ms. Solo's date last insured 12 of

23  '06, and I have a protected filing date 12/21 of '01."  The ALJ stated for the world that she proceeded

24  on plaintiff's disability insurance claim.  Again of key importance, plaintiff filed only a disability

25  insurance application, and it is the only application on record.  Plaintiff is unable to convert such

26  application into a SSI application, which was available to her when she filed her disability insurance

27  application.

28  / / /

1

## CONCLUSION AND ORDER

2    For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

3 properly concluded plaintiff is not disabled. This Court further finds the ALJ's decision is supported by

4 substantial evidence in the record as a whole and based on proper legal standards. Accordingly, this

5 Court DENIES plaintiff's request to reverse the Commissioner's decision to deny plaintiff disability

6 insurance benefits or to remand for further proceedings. This Court DIRECTS the Court's clerk to enter

7 judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security, and against

8 plaintiff Eleanor S. Solo and to close this action.

9    IT IS SO ORDERED.

10 **Dated:    June 16, 2006**                    /s/ Lawrence J. O'Neill
   66h44d                                   UNITED STATES MAGISTRATE JUDGE

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28